*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT CHARLES ANDREWS, JR.,

        Defendant-Appellant.

UNPUBLISHED
March 21, 2024

No. 361964
St. Clair Circuit Court
LC No. 21-001526-FC

Before: GADOLA, C.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), three counts of second-degree child abuse, MCL 750.136b(3), and two counts of third-degree child abuse, MCL 750.136b(5). We affirm.

## I. BASIC FACTS

Defendant's convictions arise from the mistreatment of four stepdaughters, KK, AK, EK, and CK. After the victims' parents divorced in 2012, their mother, Janelle, began a relationship with defendant. Shortly thereafter, Janelle and her four daughters moved in with defendant, who had three children of his own. During the relevant time periods, Janelle worked and defendant stayed home taking care of the children. The testimony at trial focused on how defendant treated the victims. According to that testimony, defendant would, among other things, strike them, prohibit them from getting food themselves, and would sometimes make some of them eat food off the floor.

Regarding particular instances of physical abuse, EK testified that one of defendant's sons hit her in the head with a metal lunchbox. After EK started to cry, defendant told her it did not hurt "that bad," took the lunchbox and struck her again with it, causing blood to run down her face.

-1-

The injury left a permanent scar on her forehead.[1]  The victims testified that defendant regularly punched them in the stomach, and that defendant would force the children to do "up-downs" or squats as punishment, and would make the children do them for hours or hundreds of repetitions.

Testimony was also presented that defendant would remove both EK and CK from their bedrooms in the middle of the night and take them to an outdoor shed, where he would strike them, sometimes with objects and sometimes by punching.  Defendant would also have EK and CK lie on the ground and he would place weights on them, such that they felt that they could not breathe. EK and CK additionally testified that defendant had taken both of them to the bathroom in the middle of the night and repeatedly shoved their heads under water in the bathtub.

With respect to the CSC-I count, CK, who was 12 years old at the time of trial, testified that when she was five years old defendant called her into his bedroom, took her clothes off, and sexually penetrated her with his penis.

The jury convicted defendant on all counts, and this appeal followed.

## II.  FAILURE TO CALL EXPERT WITNESS

Defendant first argues that he was denied the effective assistance of counsel because his counsel failed to consult an expert.

Generally, ineffective assistance of counsel arguments involve a mixed question of law and fact.  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).  This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).  However, when no evidentiary hearing is held, this Court's review "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

Defendants have the right to the effective assistance of counsel.  *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009).  Effective assistance of counsel is presumed and the defendant bears a heavy burden of proving otherwise.  *LeBlanc*, 465 Mich at 578.  Generally, to establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different.  *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

---

[1] The victims' biological father testified that during one of his weekend visits with the children, he saw EK with her hair combed over in an unusual manner, and when he moved the hair to the side, he saw a deep wound on her forehead.  The father contacted Children's Protective Services many times starting in 2014, but no action of significance occurred until 2020, when the children eventually were removed from defendant's and Janelle's care.

Defendant maintains that trial counsel performed deficiently by not consulting an expert in clinical psychology, forensic interviewing, or child memory and suggestibility. However, defendant does not adequately explain why such a consultation was needed or how it would have had a reasonable probability of producing a different outcome at trial. Although defendant vaguely suggests that such an expert would have assisted counsel "in targeting any issues of unreliability" in the claims and educated the jury on how to evaluate the victims' testimony, there is nothing in the record or offered on appeal to show that such a consultation was necessary for this purpose or would have had that effect. Defendant's reliance on *Trakhtenberg*[2] is misplaced, for although *Trakhtenberg* recognizes that the failure to consult an expert can constitute ineffective assistance of counsel, it does not stand for the proposition that an expert is always needed in a criminal sexual conduct case involving a minor. An expert was needed in that case because of the circumstances of the complainant having been subjected to nonforensic interviews before having a forensic interview. Here, there is no evidence that CK was subjected to any nonforensic interviews or leading questions before she disclosed the sexual assault.

Defendant also argues that an expert could have educated the jury about pedophile profiles. However, defendant has not offered any authority stating that someone who commits CSC-I on a minor has to exhibit pedophile traits. Indeed, whether defendant was truly a "pedophile" was not necessarily pertinent for determining whether, on *one occasion*, he sexually penetrated CK. In other words, defendant could have penetrated CK without being a "pedophile," which involves having a "sexual perversion in which children are the preferred sexual object." *Merriam-Webster's Collegiate Dictionary* (11th ed). Defendant could have penetrated CK as another means to assert power and control over her, without children being his preferred sexual object.

The record evidence does not support defendant's argument that defense counsel was ineffective by failing to consult an expert. Counsel's main defense was that the victims were fabricating their stories together, which is why they were all so consistent, because they wanted to live with their father. Defendant has not shown how an expert would have aided that defense, or how another defense was objectively better. Just because a defense was not successful does not mean that counsel acted deficiently. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001). Defendant has failed to overcome the presumption that counsel's strategy was reasonable under the circumstances.

---

[2] In *Trakhtenberg*, defense counsel was ineffective because she (1) failed to identify the factual predicate of the charged counts of second-degree criminal sexual conduct, which made it impossible to develop a defense, (2) failed to consult with key witnesses who would have revealed weaknesses with the prosecution's case, and (3) unreasonably did not fully investigate the case. *Trakhtenberg*, 493 Mich at 53-55. Regarding the failure to consult key witnesses, the Supreme Court noted that "given the exposure the complainant had to multiple interviews and leading questions, a reasonable attorney would have consulted an expert . . . to testify regarding the propriety of how the complainant made her allegations." *Id*. at 54.

## III. PRECLUSION OF WITNESSES

Defendant next argues that the trial court abused its discretion by precluding Lottie Daggett and Frances Sullivan from testifying, and argues that the preclusion deprived him of his constitutional right to present a defense.

## A. BACKGROUND

On the first day of trial, after the jury was selected, but before any witnesses were called, both counsel acknowledged that there was a mutual sequestration agreement. The substance of the agreement was not discussed, and the trial court simply acknowledged the agreement with an "okay." After the first day of trial, defendant called his mother, Lottie Daggett, twice from jail. Because defendant was in jail, the calls were recorded. During the conversations, Daggett indicated that the defense "did great today." When defendant asked how Daggett knew that, she replied that "Jeff called me and then he called Sean, and then Sean called Frances, and Frances called me, and we discussed it all."[3] Daggett later stated, "Frances was not happy, I was not happy. We have rebuttals for everything that was said today." Defendant again asked Daggett how she knew what was said and Daggett responded that "Jeff called us and told us everything." Daggett also referenced certain aspects of the testimony of RA, defendant's biological daughter who shared a bedroom with EK and CK.[4]

At the start of the second day of trial, the prosecutor brought the call to the trial court's attention. The court confirmed with defense counsel that an agreement was made about sequestering the witnesses, and further inquired whether it was counsel's understanding that no one was to share what occurred in trial with the sequestered witnesses. Although defense counsel initially stated, "That was not discussed," he admitted that *his* understanding of what sequestration involved included a prohibition on disclosing to sequestered witnesses what was presented during trial.

After the prosecution rested on the second day of trial, the trial court addressed the recorded calls and the potential sequestration violation. The court was concerned with what it heard from the calls, especially when Daggett noted that she knew what was said in court and referred to specific instances of RA's testimony. The following morning, the trial court stated that it was "obvious" that Daggett had heard about the testimony and discussed it with Frances, which constituted a "clear" and "egregious" violation of the sequestration order. The court acknowledged that it had three remedies available: (1) holding the witness in contempt, (2) permitting cross-examination concerning the violation, and (3) precluding the witness from testifying. Given the severity of the violation, the trial court prohibited Daggett and Frances from testifying. A third person, Sean, who also was mentioned in the call, would be allowed to testify, but he could be cross-examined regarding the violations.

---

[3] Defense counsel admitted that Daggett's reference to "Jeff" was to him, but he denied relaying the contents of the testimony to anyone.

[4] RA did not testify at the preliminary examination.

B. ANALYSIS

A trial court's decision to exclude a witness from testifying for violating a sequestration order is reviewed for an abuse of discretion. *People v Roberts*, 292 Mich App 492, 502-503; 808 NW2d 290 (2011). Any factual findings are reviewed for clear error. *People v Galloway*, 259 Mich App 634, 638; 675 NW2d 883 (2003). Because defendant never argued in the trial court that his right to present a defense was being impaired, that constitutional argument is not preserved. See *People v Bosca*, 310 Mich App 1, 46; 871 NW2d 307 (2015), rev'd in part on other grounds 509 Mich 851 (2022).

We review unpreserved constitutional issues for plain error affecting defendant's substantial rights. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). "Under the plain-error rule, defendant bears the burden to prove (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279-280; 989 NW2d 832 (2022) (quotation marks and citation omitted). Even if satisfied, reversal still is not warranted unless "the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence." *Id*. at 280.

"Few rights are more fundamental than that of an accused to present evidence in his or her own defense." *People v Unger*, 278 Mich App 210, 249; 749 NW2d 272 (2008).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. [*Washington v Texas*, 388 US 14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).]

"However, an accused's right to present evidence in his defense is not absolute." *Unger*, 278 Mich App at 250. "A defendant's interest in presenting evidence may thus bow to accommodate other legitimate interests in the criminal trial process." *Id*. (quotation marks, citation, and ellipses omitted).

Defendant initially avers that no agreement regarding sequestration was placed on the record, as indicated by the court's statement that "we'll address those issues when the time comes." Viewing this statement in context, however, it is clear that the court was not referring to sequestration, but rather was referring to the issues of the defense potentially calling two witnesses, whom the prosecutor had listed on her witness list but purportedly was not going to call herself. Indeed, defendant's interpretation is not logical. With opening statements about to begin, it makes no sense that the court would defer to consider the sequestration of witnesses "when the time comes." The time for such consideration was right then and there, and the court responded with an "okay" to counsel's statement that an agreement existed. Moreover, the court did not address sequestration again before any witnesses testified, which reinforces that the court did not intend to address the parties' sequestration agreement at a later time. Clearly, the time for sequestration would be, if not right before opening statements, before the first witness testified. See MRE 615

("At a party's request, the court may order witnesses excluded so that they cannot hear other witness' testimony."). Additionally, the day after the agreement was noted, the trial court asked defense counsel if the parties had agreed to sequester witnesses, and counsel replied, "Yes, we did agree." Thus, the record is incontrovertible that the parties had agreed to sequester witnesses.

According to defendant, however, any agreement only encompassed preventing witnesses from being in the courtroom while other witnesses testified and did not preclude the parties or attorneys from informing sequestered witnesses about what other witnesses said. To that point, our decisions have made clear that "a sequestration order alone does not automatically put the witnesses on notice that they are not to discuss their testimony . . . ." *People v Davis*, 133 Mich App 707, 714; 350 NW2d 796 (1984), citing *People v Stanley*, 71 Mich App 56, 61-62; 246 NW2d 418 (1976) ("When witnesses are excluded from the courtroom, however, they are not automatically put on notice that they are not to discuss their testimony."). But despite this law, the record established that defense counsel—whom the trial court found had informed Daggett and Sullivan about the testimony from the first day of trial—acknowledged that he understood that the sequestration agreement included a prohibition on disclosing information to the sequestered witnesses. Given counsel's understanding of the agreement, the principle in *Davis* and *Stanley* has no application.

Nonetheless, we must still determine whether the trial court abused its discretion in excluding the witnesses from trial. "The purposes of sequestering a witness are to prevent him from coloring his testimony to conform with the testimony of another and to aid in detecting testimony that is less than candid." *People v Meconi*, 277 Mich App 651, 654; 746 NW2d 881 (2008) (quotation marks and citations omitted). There are three remedies for the violation of a sequestration order:[5] "(1) holding the offending witness in contempt; (2) permitting cross-examination concerning the violation; and (3) precluding the witness from testifying." *Id*. (quotation marks and citations omitted). Factors to consider in determining whether preclusion is warranted include whether the violation resulted from an innocent mistake, whether a party or witness was blameworthy for the violation, and whether the violation was "purposeful." *Id*. at 654-655.

In this instance, the trial court recognized that the preclusion remedy was to be utilized in extreme cases. However, the court found that the agreement had been violated because Daggett's comments made it clear that she had been informed of what witnesses said on the first day of trial. The court noted, among other things, that Daggett commented on some of RA's testimony and that there was no other way for her to have known what was said unless she had been informed by someone. Importantly, RA did not testify at the preliminary examination, so Daggett could not

---

[5] Although these are remedies associated with violation of a sequestration *order*, we see no reason why they generally would not apply to a violation of a sequestration *agreement*. First, MRE 615 provides the controlling rule, and the parties' agreement (acknowledged by the court) made that rule applicable to the proceedings. Additionally, because adoption of the rule for the proceedings occurs at the start of trial, it is unusual for a written order embodying the sequestration rule to be entered at that time. And not doing so does not prevent the rule from existing, or being addressed on appeal. See, e.g., *United States v Rhynes*, 218 F3d 310, 313 (CA 4, 2000) (*en banc*).

have relied on any prior testimony to deduce RA's anticipated trial testimony. Indeed, when defendant directly asked Daggett how she knew what had been said at trial, she replied that defense counsel had told her and Frances "everything." Daggett further told defendant that she and Frances "have rebuttals for everything that was said" that first day.

The trial court's findings that there was a "clear" and "egregious" violation and that both Daggett and Frances had been "tainted" are not clearly erroneous. According to Daggett, she and Frances had been told by defense counsel about the contents of everyone's testimony that first day, and a reasonable interpretation from her own statements is that she and Frances were going to color their testimony in response to what those other witnesses had said, clearly thwarting the purpose of the sequestration agreement. See *id*. at 654. Given the serious nature of the violation, the trial court did not abuse its discretion by precluding Daggett and Frances from testifying. The fact that Daggett and Frances may not have been aware that it was impermissible for them to discuss others' testimony is not pertinent because defense counsel, who was attributed to informing them about the testimony, was aware.

And, contrary to defendant's assertion, the trial court did not fail to consider a remedy short of excluding Daggett's and Frances's testimony. The record shows that the court considered the three available remedies and, given the extreme circumstances, selected preclusion of the testimony. Proof of the exercise of discretion is that, with respect to witness Sean Sullivan, the court allowed him to testify and be cross-examined about any inappropriate contacts, reflecting the trial court's individualized assessment of the appropriate remedy.[6]

In this instance, a legitimate interest in the criminal trial process existed to not allow witnesses to testify who appeared to color their testimony to address other evidence. Given the trial court's findings pertaining to the severity of the violation, and the court's acknowledgment of the controlling law, defendant cannot show how the preclusion of Daggett's and Frances's testimony was a clear or obvious error.

Moreover, assuming there was plain error, defendant has not demonstrated that the error affected the outcome of the trial. Defendant was convicted primarily on the basis of the victims' testimony. The incidents of abuse as described by them all occurred when no one else was present. Defendant has not presented, either in this Court or the trial court, any offer of proof of what Daggett and Frances would have specifically stated at trial. Without that information, defendant cannot satisfy his burden of establishing the requisite prejudice. Even assuming that Daggett and Frances would have testified that they had only witnessed model parenting behavior from defendant, that would not have altered the outcome of the trial, as it would be duplicative to the testimony provided by defendant's biological children, defendant's half-brother, defendant's

---

[6] This case is easily distinguishable from *Meconi*, in which the purported violation was characterized as an "innocent mistake" and the witness was only exposed to "short opening statements, not testimony." *Meconi*, 277 Mich App at 654-655. Under those circumstances, which are vastly different from the present case, it was an abuse of discretion for the trial court to preclude the witness from testifying. *Id*. at 655.

neighbor, and defendant's stepfather. Therefore, defendant also has failed to show how any purported plain error affected his substantial rights.

## IV. VOUCHING FOR VICTIMS' CREDIBILITY

Defendant also argues that he was denied a fair trial because a witness described the victims as "honest."

A defendant must raise an issue in the trial court to preserve it for our review. *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Defendant concedes that whether he was deprived of a fair trial is unpreserved because he never raised that issue in the trial court or otherwise objected to the witness's testimony. We review unpreserved constitutional issues for plain error affecting defendant's substantial rights. *Wiley*, 324 Mich App at 150.

During the prosecution's case-in-chief, it called Children's Protective Services (CPS) Investigator Nicole Bowers to testify. Bowers was an investigator on the most recent reporting to CPS and had contact with the victims in August 2020. In response to the prosecutor asking Bowers what "the demeanor of the [victims]" was during her interview with them, she answered:

> I would describe them as, um, honest, very straight to the point, um, there were you know, a lot of details, um, of location, how it made them feel, you know, things of that nature regarding, um, I guess the questions and then describing the abuse or neglect.

As our Supreme Court has explained:

> Because it is the province of the jury to determine whether a particular witness spoke the truth or fabricated a cock-and-bull story, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. Such comments have no probative value, because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. As a result, such statements are considered superfluous and are inadmissible lay witness opinion on the believability of a witness's story because the jury is in just as good a position to evaluate the witness's testimony. [*People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013) (quotation marks, citations, and brackets omitted).]

Although this principle primarily pertains to in-court comments regarding the in-court testimony of other witnesses, it also applies to a witness's out-of-court comments. See *id*. at 353-354.

Initially, we observe that Bowers was asked to describe the *demeanor* of the children during their interviews, not to assess their *credibility*. Thus, Bowers's use of the word "honest" was not responsive to the question, and may not have been taken as going towards the witnesses' credibility. Additionally, one way to describing one's demeanor is "direct and uncomplicated," *Merriam-Webster's Collegiate Dictionary* (11th ed), which seems to match Bowers's other description that the children were "very straight to the point." Thus, we cannot conclude that any error was plain, i.e., clear or obvious.

Assuming the error was plain, defendant has failed to show how the comment was outcome-determinative. Bowers's comment was a fleeting, isolated comment that no party ever referenced again during trial. The jury had the opportunity to view the victims and defendant on the stand and assess their credibility. There is simply nothing to suggest that Bowers's assessment of the victims' demeanor as being "honest" swayed the jury in any manner. Moreover, Bowers did not have an extended amount of time or contact with the children. She was the on-call investigator and made the initial meeting with the children after the latest complaint was received by CPS. After that meeting, the case was assigned to a regular investigator. There is no reason to believe that the jury would give much weight to Bowers's assessment, given her slight involvement with the case and children.

Defendant also argues that defense counsel was ineffective by failing to object to Bowers's testimony. However, it was reasonable for defense counsel not to object to the testimony. First, because of the way the question was asked and the varying definitions of "honest," it is not evident that an objection would have been successful under the circumstances. Relatedly, an objection would have likely invited a lengthy discussion regarding "demeanor" and how demeanor is not the same as credibility. Regardless of the type of discussion, it would bring the "honest" comment to the forefront of the jury's attention. It was reasonable for counsel to simply ignore the isolated comment and not bring any more attention to it. As has been said, "there are times when it is better not to object and draw attention to an improper comment." *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995). It would have been perfectly reasonable for defense counsel to have held that same thought in this instance and decide not to object. Moreover, assuming that counsel's performance fell below an objective level of reasonableness, as we have already concluded, defendant cannot show that there is a reasonable likelihood of a different result but for counsel's error.

Affirmed.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray